Lyman H. Smith, J.
This is a petition, which, in accordance with article 7 of the Beal Property Tax Law, seeks a *282 judicial review of an assessment made by respondent Wagner, Assessor of the City of Rochester, and upheld by respondent Board of Assessments Review for the City of Rochester for the tax year 1970-1971 on a certain office building, constructed and owned by Genesee Hospital, Inc., a tax-exempt hospital.
To the extent that the subject office building is rented, in part, to approved private physicians serving the petitioner hospital, the petition presents novel questions of fact and law for the court’s determination.
The court is called upon to decide whether the assessment of the petitioner (hereinafter sometimes referred to as Gene-see) is valid in light of section 421 of the Real Property Tax Law (formerly § 420, renumbered § 421 by L. 1971, ch. 417, § 5) which statute exempts from taxation real property owned by a corporation or association which, inter alia, is organized for hospital purposes and used by that corporation in furtherance of exempt purposes. Although petitioner originally requested in its petition, relief for the tax year 1970-1971, it has moved upon trial to amend its petition to include a separate cause of action for declaratory relief on the question of the tax status of said property for 1972 and thereafter. This motion is now granted for the reason that such disposition will work no prejudice to respondents, since they were not required under the original pleadings to serve an answer in this matter (Real Property Tax Law, § 712) and, therefore, are deemed to have denied each and every allegation of the petition.
Petitioner is a voluntary, nonprofit membership corporation (hospital) organized and existing under the laws of New York State for the purpose of providing medical care and, as such, has been exempt from taxation on its property prior to this proceeding. Since 1947 it has also operated as a teaching hospital with a staff of full-time physicians working on salary, together with its own resident physicians and interns-in-training, and third and fourth-year medical students serving on a rotating basis from nearby Strong Memorial Hospital.
Petitioner (Genesee) presently enjoys a world-wide reputation as one of the premier operational and teaching hospital facilities in the Hnited States. This reputation is enhanced by the working combination of its approved house list of private practicing physicians and specialists led by its distinguished permanent staff.
' The full-time operation of this large hospital in rendering service to the community, as well as functioning as a teaching institution, is based upon the unique combination of its “ house *283 staff” and its “attending physicians ”, especially including those physicians in private practice who, in exchange for the privilege of being able to place patients with petitioner hospital, agree to assist in providing practical experience to interns, residents and medical students during their rounds, without compensation. Many of these physicians participate in, and conduct on a scheduled basis, formal lectures and conferences. It is fair to state that 90% of the continual educational process takes place in the hospital in an informal, bedside, “ show and tell ” manner in small group sessions. The vital role played by these participating private practitioners in terms of, not only patient care, but education, is hardly subject to overstatement. Their role is a most integral part of the hospital function and of the facility in question.
Recognizing that the competition for top-flight interns and residents would be increasing, concerned about falling behind in its race to attract highly qualified personnel to join its “house staff”, and realizing fully the direct relationship between the level of health care provided to its patients and the quality of its medical personnel, the directors of the hospital in 1967 approved the construction of a three-story office building adjacent to the hospital itself and connected thereto by indoor corridors at the basement and second story levels. The Doctors Office Building thus constructed was designed to provide the private practicing physicians on the staff of the hospital (“ attending staff ”) with private office space in which they could examine and treat patients without limitation as to time or income earned. The building is open only to physicians attached to and enjoying full privileges at the hospital. Rents were fixed at currently competitive rates and the physicians were asked to enter into five-year leases with the hospital.
The subject building was completed in October, 1969 at a cost to the hospital of $1.7 million. It has approximately 13,000 square feet of usable space on each of its three floors. (total, 39,000 sq. ft.) and 9,000 square feet in the basement. At the time of trial, 40 physicians (17 surgeons, 15 internists, 4 OB-GYNS, 3 pediatricians, and 1 dentist) were occupying 28,480 square feet of usable office space in the building. In addition, another 7,429 square feet was divided among an ambulatory X-ray unit formerly located in the hospital and staffed by four radiologists, an office and research area for the hospital’s chief of surgery, and the hospital’s complete nutrition clinic. The remaining 25% of the building is expected to *284 have an ambulatory care unit which is currently located in the hospital building itself.
On October 1, 1969, the taxable status date[1] for the City of Rochester, the respondent assessor (Wagner) published the assessment rolls for the city, -assessing the Doctors Office Building at a value of $430,000. Petitioner protested this assessment as being invalid pursuant to section 420 of the Real Property Tax Law (now § 421) before the respondent Board of Tax Assessment Review on March 11, 1970, but was subsequently denied tax-exempt status on the property. On May 18, 1970, respondents were served with copies of the verified petition herein.
Petitioner’s basic contention is that since the hospital has been declared tax-exempt, due to the fact that it is a corporation organized to provide hospital care, the Doctors Office Building should, likewise, be tax-exempt on the ground that it is property owned by the hospital and used in furtherance of the hospital’s exempt purposes. Respondents counter that, to enjoy exempt status, the building would have to be used “ exclusively ” for such exempt purposes. They argue that the building is not “used exclusively” to provide hospital care and medical education, but to the contrary, provides private practitioners a setting for earning profits in their private practices, a use not entitling the building to exempt status under section 421 of the Real Property Tax Law.
The relevant portions of the statute in question read as follows: [1] ‘ Real property owned by a corporation or association organized or conducted exclusively for * * * hospital * * * purposes * * * and used exclusively for carrying out thereupon one or more of such purposes either by the owning corporation or association or by another such corporation or association * * * shall be exempt from taxation as provided in this section.” (Real Property Tax Law, § 421, subd. 1, par. [a].) Further, the statute provides: “If any portion of such real property is not so used exclusively to carry out thereupon one or more of such purposes but is leased or otherwise used for other purposes, such portion shall be subject to taxation and the remaining portion only shall be exempt ” (Real Property Tax Law, § 421, subd. 2).
There is no dispute that the petitioner herein is a corporation “organized or conducted exclusively for hospital purposes” and is, therefore, generally entitled to tax-exempt status. Nor *285 is there any question concerning the hospital’s ownership of the subject building. The bone of contention is whether the Doctors Office Building is ‘ ‘ used exclusively for carrying out thereupon ’ ’ the tax-exempt purposes of the hospital, thereby exempting it under section 421 of the Real Property Tax Law.
A literal interpretation of the word ‘ exclusively ’ ’, as it appears in the statutory language (Real Property Tax Law, § 421) might render this property taxable. Our courts, however, have not construed the term that strictly. (People ex rel. Watchtower Bible & Tract Soc. v. Haring, 8 N Y 2d 350.)
The Court of Appeals in WatcMower Soc. stated (p. 358) that the test for exemption is whether the property in question ‘ ‘ is reasonably incident to the major purpose of its owner.”
Similarly, Mr. Justice Bastow, writing for a unanimous court in Matter of Faculty-Student Assn. of State Univ. Coll, at Oswego v. Sharkey (35 A D 2d 161, 162, affd. 29 N Y 2d 621) pointed out that subdivision 2 of section 420 of the Real Property Tax Law (now Real Property Tax Law, § 421) “permits uses incidental to the exempt purposes.” (See, also, Matter of St. Luke’s Hosp. v. Boyland, 12 N Y 2d 135; Matter of Ellis Hosp. v. Fredette, 27 A D 2d 390.) Using such a standard, it is the finding of this court, de facto and de jure, that this office building is tax-exempt.
The evidence presented overwhelmingly emphasizes a commendable concern on the part of the hospital to maintain a first-rate hospital facility, both in terms of patient care rendered and the educational program provided. The evidence also clearly indicates that these two areas of concern are so closely akin to each other that they mutually and inevitably complement one another in such a setting. The Doctors Office Building was an attempt to insure that both such concerns were adequately dealt with. While no other hospital in the Rochester area has such an arrangement for housing physicians’ offices adjacent to the main hospital building, some of the larger facilities (e.g., Strong Memorial Hospital, University of Rochester) provide office space within the hospitals themselves. This concern for the close proximity of the “attending staff” to the hospital was brought out by Mr. Herman Waggershauser, chairman of the hospital’s Long Range Planning Committee which originally studied the need for the building: “ It then developed that in order to improve the education of physicians and doctors that it became essential to make it possible for doctors to be close to the hospital, and out of this concept developed the Doctors Building, and the primary purpose, the only purpose, as far as *286 the hospital was concerned, was better medical care for the community, for the patient, and improved training and education for the doctors while they were [there]
Mr. Herbert Erauss, administrator of the hospital, testified concerning the intense competition to attract highly qualified interns and residents, referring to an average of two openings for every one such available person throughout the county: “ Insofar as the competition to operate a quality teaching hospital has become so intense, we are eager to upgrade the quality of our program by having more doctors participate for longer periods of time, and to the extent that we achieve this objective, we will have an advantage in the competition to secure interns, residents and fellows. We figure if we do not win this race, with the odds there are in the medical education, we probably would become a second-rate hospital, because without the medical education, you do not do as good a job ”.
Citing high taxes in New York State, and the particularly severe winters experienced in the Rochester area, several physicians on the hospital’s staff, some with offices in the subject building, testified concerning the need for a doctors’ office building adjacent to the hospital as a means of improving patient care and upgrading the quality of education provided at the hospital, as well as attracting highly qualified interns and residents, who insure both better care and teaching. For example, Dr. Thomas O’Malley stated on redirect examination “ If you look at what has been happening in the northern United States, there has been a migration of young doctors to the South, to the west coast, and to Denver. None of them wish to locate up in New York State very much any more. One reason they give is the weather, and the other reason they look at there is a very high tax situation in New York, which plays a part, but basically, I think the weather plays a great part in where they want to locate now, and the movement has been to the west coast, to Denver, and the South. Atlanta is, you know, becoming very attractive for medical practitioners. If you look at the whole of Rochester, including Strong Memorial Hospital, which is considered, I think, among the top three training places in the United States, they have trouble filling their internships at this time. It is not just Genesee. We have been able, however, because of the fact that we have, and I think, one of the factors that plays a part in it, is we have been able to attract extremely good faculty, which is the backbone that you are going to have in order to then go out and attract a good — a good backbone, rather, of faculty to go out and attract stu *287 dents. For example, because we had that medical building, we could entice Renee Menguy, an internationally known figure in surgery to leave his job as chairman of the Department at the University of Chicago, and come and locate in Rochester, and bring his grants with him, and bring his research with him, and we have been able to provide him space, and we have been able to attract Bill Chey from Philadelphia, because when you get one, the others will follow, and once we get our faculty, then we will be able to better compete with Denver, Atlanta, and California, and get students really interested in learning medicine to stay in the northern United States.”
In addition, those physicians questioned upon the trial were almost unanimous in claiming that the use of the Doctors Office Building has been, a success in improving both the quality of the health care provided and the level of teaching in the hospital, several noting that a very high percentage of the teaching by the ‘ ‘ attending staff ’ ’ has been done by those physicians located in the new office building. Dr. Dickerson testified: ‘ ‘ Specifically, things come up on a day-to-day basis, continually, day in and day out, without prediction, that I can attend to personally by virtue of being in proximity, that I could not attend to, or could not in the same manner, if I were located across the city or in some other location. I had an opportunity before, to compare trying to be chief of orthopedic surgery, before being in the present building, and it was far more difficult, and there were things that I could not do as well, that I am able to do now. It might be a matter of questions come up in the emergency department, and questions come up in the operating room, or it might be a matter of how to get someone onto an elevator from the orthopedic floor who has a broken leg, and the nurses are not sure how to do this, and the patient is there, and they need someone to help them. Now I can walk next door in a moment, and see that the situation is attended to, or do things that would not be possible if I were not in proximity ’
Further, Dr. Dickerson, when asked, " Q. Do you conduct in your private office, do you conduct any education of the residents and the internes? ”, responded, “A. Yes, I was getting started with the residents, but at all levels, and the medical students, when they come, they need to see patients along with physicians seeing patients in that specialty. With the office where it is now, the medical students assigned to the Genesee Hospital for orthopedic surgery, in this instance, are able to come next door and see patients with me, or with other *288 attending orthopedic surgeons, or on the staff of the Genesee Hospital, and who are available in the Doctors Office Building, seeing patients. This occurs, and the students benefit from this.5 ’
There is more than a preponderance of evidence here that this office building was constructed and is now operated for purposes “ reasonably incident” to the exempt purposes of the petitioner, i.e., the providing of health care to the community. The increased availability of its “attending staff” of private practitioners improves patient care and expands the bedside teaching role of such physicians, which, in turn, is effective in attracting top-grade interns and residents to make up the ‘[1] house staff ’ ’. In passing, it may be noted, as respondents have pointed out, that an expanded teaching responsibility was not an absolute requirement for occupying* office space in the building. But it has worked out that way. Clearly, the increased availability of the private ‘ ‘ attending staff ’ ’ has improved both the educational quantum and quality available to residents and interns. It is equally clear that such availability directly improves patient care. Beyond that, it is fair to state that such availability has an indirect bearing* on the level of patient care rendered in the hospital, since such close proximity attracts a superior “house staff” of residents and interns who, obviously, constitute the first line of patient care and serve as the backbone of service to the community.
Nevertheless, the respondents contend that the primary use of the building is to allow tenant physicians to practice their professions and make personal profits. In such a setting, the respondents argue, a tax-exempt status is unwarranted. Upon all the evidence this court is compelled to reject this contention. Indeed, there has been no showing that the original intent in constructing this facility was to personally benefit the physicians concerned. To the contrary, the preponderant weight of the testimony reveals that the overriding motivation for the building* was to improve the hospital’s service to its patients and, thereby, to the community at large. As Mr. Krauss, administrator of the hospital, said “ Well, the only purpose of the hospital in building* this was to improve its hospital operation to patient care and teaching. Doctors can, with money at their disposal, own an office one mile or ten miles from the hospital, and own a successful practice, and we are not worried about their suffering.” It is hardly logical to conclude, nor will the evidence here support the conclusion, that *289 the hospital invested $1.7 million primarily to benefit a group of physicians already successfully established in their practice.
Perhaps the time has come to recognize that a modern, working hospital together with its highly trained staff of attendant physicians, nurses and peripheral service personnel is as important an investment to any community as the ubiquitous highway bridge over its local river, as is for that matter, any public utility, without which the lives, safety and well-being of the community’s citizens would be jeopardized.
While it may be true that large personal incomes are derived from certain medical practices carried on in this building, a matter not brought out at trial, no portion of such moneys falls into the hands of the hospital, its officers or employees. In any event, this court finds as a matter of fact, that the moneys received by petitioner in the form of rents have, at this point, been insufficient to offset the operating and maintenance costs of subject building.
Finally, tax-exempt status is not determined by the lessees’ use of the building, but rather, the owner’s (Real Property Tax Law, § 421, subd. 1). The fact that the physicians occupying the building generate income from using it cannot overshadow the resultant increased availability of those same physicians to attend their patients in the hospital and, in so doing, to provide expanded teaching services to the “ house staff” of interns and residents. In fact, the subject building makes availability possible. The hospital personnel involved in Matter of St. Luke’s Hosp. v. Borland (12 N Y 2d 135, supra) and Matter of Ellis Hosp. v. Fredette (27 A D 2d 390, supra) did not use the property in question for hospital purposes, but rather, only for residential and parking purposes. But the hospital owners were able to provide better patient care from their ownership and operation of the properties in question. Indeed, this was the key to their tax-exempt status. Similarly, it is the petitioner’s use of the Doctors Office Building here that compels this court to conclude that it should be given exempt status. The close proximity of those physicians occupying the building and the consequent availability of their educational and medical services to the hospital is a purpose “ reasonably incident ” to the exempt purposes for which the hospital was organized. Such was the primary purpose for which this building was constructed and it continues to be the primary purpose for which it is maintained.
For the foregoing reasons, it is the opinion of the court that such property shall be totally tax exempt pursuant to section 421 of the Real Property Tax Law.

. For the definition o£ “ taxable status date ”, see section 302 of the Real Property Tax Law.